STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. FANNIE LEDERMAN, PLAINTIFF IN ERROR.

Argued November 23, 1933—Decided February 2, 1934.

For the state, *William A. Wachenfeld,* prosecutor, and *Joseph E. Conlon.*

For the plaintiff in error, *Joseph Kraemer* and *Charles Handler.*

The opinion of the court was delivered by

CASE, J.  Fannie Lederman, herein called the defendant, was convicted in the Essex Oyer and Terminer in the second degree for the murder of her husband, David Lederman.  The case comes up on bill of exceptions and also under the one hundred and thirty-sixth section of the Criminal Procedure act.

Defendant gathers the alleged errors under four points. We shall discuss the last one first.  It is that the verdict is against the weight of the evidence.

The defendant was forty-eight years of age. She lived with her husband and four children, ranging from twelve to twenty years of age, in a second-story apartment consisting of four rooms arranged in a straight line, one behind another. The front hall ran longitudinally with the apartment, and had a door entering the front room and another entering the kitchen, where the hall ended. The kitchen had a back door opening on a porch that was used in common with other tenants. A family named Rudy lived in the apartment on the opposite side of the hallway.

Rose, the youngest child, returned from school on Monday, March 13th, 1933, at about half past eleven o'clock. She entered the front hall and, finding both doors locked, knocked so loudly that she was heard by the Rudys. She finally gained entrance by going through the Rudy kitchen and over the back porch into the Lederman kitchen. There she heard her mother moaning. Her father was dead on his bed in the room adjoining the kitchen, and her mother was lying on the floor of the room next forward. A hospital was notified. The house surgeon came immediately. The defendant was still lying on the floor, apparently unconscious. The physician was convinced by a nerve test that the woman was not in fact unconscious; he further concluded that, although she had bruises on both cheeks, the blows that caused those marks were not sufficient to render her unconscious. A tooth of the defendant and a broken false plate from the defendant's mouth were found on the floor. The defendant was taken to the hospital. An examination there made disclosed that there was no blood on her mouth or about her lips and that her face was not lacerated. Nevertheless there were blood marks on the back of her hands and blood marks on her face such as would be caused by contact with bloody hands, but which did not appear to have come from any injury sustained by her. A microscopic and chemical examination showed that numerous spots upon her dress, apron, stockings and shoes were blood of human origin. The defendant had worn two pairs of stockings, one over the other, and a blood spot on one of the stockings, considerable enough to carry through to a

corresponding position on the stocking worn beneath, bore evidence of being watered as though in an attempt at washing. A sweater was worn by the defendant at the time she was found—significant because earlier in the morning she did not have it on.

The deceased had been beaten severely about the head, one wound on the back of the head and thirteen wounds on the face—about evenly distributed between the right and left side. The bedding at and near the pillows was drenched with blood. There was a pool of blood on the floor at the bedside, and the wall, except as protected by the person of the murderer, was spattered. Dr. Martland testified that in his opinion the deceased had died "around nine, ten or eleven o'clock—probably nearer ten than any other time." He further testified, with regard to the strength required for such violence, that although the result indicated strong blows, they "might have been administered by a twelve-year-old child." In addition to the wounds made on the occasion of the murder earlier injuries were found, consisting of bruises and lacerations made two or three days before.

The testimony of the defendant was that she had last seen her husband sitting in the kitchen smoking a cigarette; that she then proceded to clean the bedrooms and was busy in her own room when "a man came in with a mask on and I was afraid and I called my husband and the man quick come in—and he hit me in the face;" that she does not remember how many times she was hit; and that she does not know what happened after that until she found herself in the hospital. That is her brief and rather colorless story. There is little in the way of supporting incident. The room in which the decedent was found lying on the bed, done to his death, was immediately adjoining the one in which the defendant says she was attacked and in which she was discovered. The two rooms are small. It does not appear that the door between the two was closed. A considerable sound could hardly have occurred in one without being heard by a person in the other.

The state's case was entirely circumstantial, but the jury

was justified in finding guilt. The jury could well have concluded that the apparent unconsciousness of the defendant was really feigned; that the defendant's injuries were received in the course of a murderous assault upon her husband; that the spots upon the clothing were splashes of her husband's blood received contemporaneously with and as a result of his wounding; that the blood stains on her shoes came from the pool at her husband's bedside during or subsequent to the fatal assault, and that the sweater which she wore as she lay on the floor was donned by her after the attack upon her husband; all of which is contradictory of the story of the "masked man" and consistent only with the hypothesis of her own guilt.

To justify the setting aside of a verdict as against the weight of the evidence that fact must be so clear as to give rise to an inference that the verdict was the result of mistake, passion, prejudice or partiality. *State* v. *Treficanto,* 106 *N. J. L.* 344. The present case supports no such inference. The verdict was not against the weight of the evidence.

The remaining points on defendant's brief have to do with the trial court's rulings on questions of evidence. The first is that "the court erred in permitting over objection on the part of the defendant to the entire line, the cross-examination of the defendant's witness, Victor Lederman, on the collateral, irrelevant and immaterial issue, and in permitting in evidence said witness' statement made to the police as state's *Exhibit S-24,* and permitting the state over objection on the part of defendant to illegally use said examination and evidence for the purpose of proving defendant guilty of an attack made upon the deceased on March 10th, 1933, a crime not charged against her in the indictment."

*Exhibit S-24* was a statement to the police, taken down in writing on the day of the murder, made and signed by Victor J. Lederman, son of the defendant and the deceased. It was placed in evidence for the purpose of impeaching Victor's oral testimony in two respects. Not only was it explicitly offered for that purpose; the court charged *verbatim* the request submitted by the defendant so confining the use to be

made of it by the jury. A portion of the court's charge on that subject was:

"I charge you as a proposition of law that this statement, *Exhibit S-24,* the purported statement of Victor Lederman, cannot be considered as evidence against the defendant and you are entirely to disregard it as in any way tending to prove the truth of the facts which it asserts."

The alleged error in the admission of the exhibit is not properly before us, even under section 136 of the Criminal Procedure act. 2 *Comp. Stat., p.* 1863. The exhibit was offered, whereupon, there being no objection, the marking was made as of course. No court ruling thereon was evoked. *State* v. *Bassone,* 109 *N. J. L.* 176, 182; *State* v. *Garton,* 102 *Id.* 318. The defendant argues that an objection, shown upon the record as having been made seventy-two pages in advance of the offer of the exhibit, should be considered as an objection to that admission. We think not. The question to which the objection was made follows: "Was he [viz., the decedent] out of bed all day Sunday?"; to which the attorney for the defendant made this observation: "I object to that line of examination." What line was referred to does not appear, and no ground of objection was stated. We consider that so general and undefined an objection may not lie dormant through the testimony of a dozen witnesses and then, silently and unnoticed, attach to the introduction of an exhibit.

In addition, we find no reason why the exhibit should not have been admitted for the purposes stated even over objection. The questions asked on cross-examination of Victor were fully justified by the evidence given on the direct. Towels of like appearance and texture with others admittedly in the ownership and possession of the defendant were found at the murdered man's head on the blood-saturated pillows. The defendant undertook to prove by Victor that the deceased on retiring the night before had applied poultices to his face and had used the towels to protect the bedding. That at once made pertinent the inquiry on cross-examination whether, and incidentally why, the poultices had actually been

used, and in answer came the story of an attack made, and injuries inflicted, by some one in the apartment upon David Lederman as he was sleeping at two o'clock on the morning of Friday, March 10th, three days before the murder. That information being properly elicited on the cross, the defendant, on redirect, caused the witness to testify that the assault had not been reported to the police because his father did not want that done, and that the witness himself knew that his mother had not committed the assault. It was to attack the credibility of the witness by proving that he had made a contradictory statement on those two points, that the foundation was laid for the admission of *S-24* and that the exhibit was placed in evidence. The questions asked the witness were within the compass of cross-examination. The reading of the testimony leaves no doubt that the witness understood thoroughly that the contradictory statements about which he was being asked were within the exhibit that was shown to him and that the time and place at which, and the persons to whom, the statement was made were fully comprehended. His answers were either evasive or a flat denial. The only substantial question is whether the subject-matter was such that the state was bound by the witness' answers or could complete the impeachment by proving the contradictory statement.

The contradictions consisted of written admissions by the witness (1) that the deceased wished to report the assault to the police but was talked out of doing so by the witness and the defendant and (2) that the witness had, on Friday morning, received information from his brother, Julius, who occupied the same bed with his father, indicating that the defendant was the assailant. If these matters were relevant and material, the contradictions were competent. It is said that they were incompetent because they tended to prove another crime for which the defendant might not be tried collaterally, and *Bullock* v. *State,* 65 *N. J. L.* 557, 574, and cases following in its train are cited in support.

David Lederman, Friday morning, was sleeping in the bed upon which, Monday morning, he was found murdered. He

was beaten about the head with a weapon. Only the members of the family are known to have been in the house at the time. There was identity of place, method and victim, and there was close proximity of time. The connection in time and circumstance between the earlier crime and the crime of the indictment takes, by the very language of the opinion, the instant case out of the purview of the Bullock decision. A vicious and unjustified attack made by the defendant at so near a date would tend to prove the existence of malice, which, either express or implied, is a necessary element in the crime of murder. In general, whenever the defendant's guilt of an extraneous crime tends logically to prove against him some particular element of the crime for which he is being tried such guilt may be shown. *State* v. *Raymond*, 53 *N. J. L.* 260, 265; *State* v. *Andoloro*, 108 *Id.* 47, 49. Also we think that the similarity of circumstance showed a common scheme within the theory of *State* v. *Noel*, 102 *Id.* 659, 672. The guilt of the defendant with respect to the attack of Friday morning being relevant and material, and the defense having undertaken to prove innocence out of the witness' mouth, we consider that it was competent for the state to use that testimony as a ground for impeachment.

It is next said that the court erred in overruling questions asked of Dr. Guthrie, a dental surgeon produced by the defense as an expert witness. Dr. Guthrie had not treated the defendant or examined her mouth. His evidence was based on assumed facts and circumstances except that he was shown the broken dental plate and defendant's tooth. He was asked whether the bridge and tooth had come from the mouth by force. Expert knowledge was not needed to answer that question. He was further asked a series of questions grounding in whether or not the defendant could, by adequate force and direction, have knocked the tooth from her own jaw. Important data were omitted from the questions—the condition of looseness or otherwise of the tooth and whether the plate was attached to the tooth when the blow was assumed to have been given. The questions were not, we think, properly addressed to an expert. They had to do with relative strength

and mechanical possibility (*Cook* v. *State,* 24 *N. J. L.* 843), and called for no knowledge "outside of the limits of common observation." *Crosby* v. *Wells,* 73 *Id.* 790. The methods, other than blows from one's own fists, by which a person may apply force to his jaw are limited only by the resources of his inventive genius. Even if admissible, the questions were not material and their rejection was therefore not harmful error; for, manifestly, necessity for force other than a self-inflicted blow would not exclude force used by the decedent in the effort to repel the attack made upon him.

Finally, it is argued that the overruling of questions asked of the defendant and of Dr. Danzis prevented the defendant from proving that she did not possess the strength to deliver the blows that caused the decedent's death. The defendant had testified that at the time of the crime she was wearing an abdominal belt and that she "could not go without it." The question why she could not go without it was excluded, and properly. The defendant was *not* without it. Whether, with it, she was physically weakened or incompetent was not asked. Reasons for operations performed in 1930 and 1931, and whether or not in 1931 the defendant was in good health, were too remote; also, the question of health does not necessarily involve that of strength sufficient to inflict blows upon a recumbent victim. The primary question in this respect was whether, on March 13th, 1933, wearing, as she was, her abdominal belt, the defendant was physically capable of committing the crime charged against her. Proof thereon was neither offered nor refused.

No reversible error having been committed by the trial court, the judgment below will be affirmed.

*For affirmance*—TRENCHARD, PARKER, LLOYD, CASE, DONGES, VAN BUSKIRK, HETFIELD, DEAR, WELLS, JJ. 9.

*For reversal*—THE CHANCELLOR, BODINE, HEHER, PERSKIE, KAYS, DILL, JJ. 6.