132 N.J. Super. 130 (1974)
332 A.2d 614
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
SARAH WRIGHT, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1974.
Decided August 7, 1974.
*131 Before Judges LEONARD, ALLCORN and CRAHAY.
Mr. C. Judson Hamlin, First Assistant Prosecutor, argued the cause for plaintiff-appellant and cross-respondent (Mr. John S. Kulthau, Middlesex County Prosecutor, attorney).
Mrs. Jane G. Kleinfeld, Assistant Deputy Public Defender, argued the cause for defendant-respondent and cross-appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
PER CURIAM.
On October 26, 1971 in the Tall Tree Apartments in Jamesburg, Middlesex County, defendant's daughter Kimberly died. She was then approximately seven months old and an identical twin of her sister Karen.
Defendant was indicted for manslaughter contrary to N.J.S.A. 2A:113-5. Thereafter a superseding indictment added as an offense the charge of child neglect contrary to N.J.S.A. 9:6-1 and 3, and a jury trial thereof resulted in defendant's convictions on both counts.
Defendant subsequently moved for a judgment of acquittal or a new trial. For reasons to be discussed infra, the trial court ordered a new trial on the manslaughter charge but let *132 stand the conviction for child neglect. On leave granted, the State appeals and defendant cross-appeals from the denial of a new trial as to the neglect count.
The essential theory of the State's case was that defendant was wilfully and grossly negligent in the failure to feed Kimberly as a result of which she developed malnutrition and dehydration causing her death. Additionally, it was contended that defendant should have procured medical attention for Kimberly when she observed her deteriorating condition.
Before we deal with the record, which we must do at some length, we pause to note that the kernel of these appeals and our disposition of them was the prosecution's position from the very opening of the trial that the jury should consider that Karen, the surviving twin, was, at the time of Kimberly's death in generally the same malnourished and dehydrated state. (Defendant was never charged with any alleged wrongdoing in her treatment of Karen.) It might also serve to illuminate at this point the fact that the death certificate filed the day after Kimberly's death reported the immediate cause of her death to be second and third degree burns over 15% of her body and that conditions which gave rise to the stated cause of death were dehydration and malnutrition. On January 28, 1972, approximately three months later, the death certificate was amended. The cause of death was then recorded as dehydration and malnutrition and it was reported that there were post-mortem burns over 15% of the body area.
And so to the record 
Kimberly was brought to the office of Dr. Eugene Pirog on the date of her death and was dead on arrival. (Prior thereto, on May 11, 1971, he had seen both Kimberly and Karen when they were brought to him by defendant primarily because Kimberly had a cold. At that time they were both normal and healthy.) He directed that Kimberly's body be taken to a hospital for autopsy since he felt, finding blisters on her body, that she had probably been burned. He opined *133 that blisters could only be produced in a living body but that once formed they would remain after death. As will be seen later, this opinion was disputed by other State medical witnesses.
The Chief of Police of Jamesburg, Peter Giacomozzi, testified regarding the investigation he conducted at defendant's apartment on the evening of Kimberly's death. He observed that the bedroom wherein Kimberly's body was found to be intensely hot, notwithstanding that a window was partially open and he experienced difficulty in breathing because of it. He stated that the temperature in a nearby parlor was at least 85 degrees and in his opinion the bedroom temperature was greater. He testified that he had been told that the child was found partially on a radiator between the wall of the room and the bed. At the time of his investigation he estimated that there were eight to ten inches between the wall and the bed. He did not touch the radiator because the heat was "unbearable". He was aware of complaints made by tenants in the Tall Tree apartment complex regarding heating problems although he had not personally dealt with them.
When Chief Giacomozzi arrived at the apartment two persons were present  Barry Williams and Dorothy Lawrence. Defendant was not there but rather was with a group of people in the vicinity of an ambulance which had been summoned for Kimberly.
Lieutenant Robert Reid of the Jamesburg Police testified that he arrived at defendant's apartment after Chief Giacomozzi. He observed that the living room floor was dirty with candy and popcorn. The bedroom where Kimberly was found had clothes strewn about it and the twin's bed contained neither bedding nor sheets. He, like Chief Giacomozzi, opined that the apartment was "very, very hot".
Dr. Dorothy Pietrucha, coordinator of the Pediatrics Department of St. Peter's Hospital in which Kimberly and Karen were born and to which Kimberly's body was brought testified that the twins were born on March 16, 1971 in a *134 normal birth. Dr. Pietrucha stated that on the date of Kimberly's death Karen was also brought to the hospital and was diagnosed as suffering from malnutrition. Dr. Pietrucha testified that she examined Karen three days after her admission to the hospital i.e., October 29, 1971 at which time her condition was "stable". She was however emaciated with little subcutaneous tissue. Her dehydrated state had been cured by use of large quantities of fluids. This testimony was received over defense objection but was permitted on the ground that it was so intimately related to the neglect of Kimberly that it ought not be excluded. Her clinical diagnosis of Karen's case was  "malnutrition and child neglect". Other tests were made on Karen which tended to rule out that she was suffering from any disease which might have generated the condition. Dr. Pietrucha stated that after her discharge for treatment for malnutrition and dehydration Karen returned to the hospital for a clinical visit. Testifying from clinical charts dated November 30, 1971, Dr. Pietrucha was asked who was the doctor in attendance at the time of Karen's subsequent visit to which she concededly improperly responded 
On November 30 I saw Karen again and at that time my note here is: child neglect case. Now with foster mother who is doing a very good job.
The portion emphasized was in the trial court's later view deemed "devastating" to defendant. We have labeled it "the Pietrucha answer".
Defense counsel objected and moved for a mistrial. The prosecutor conceded that the answer was an inadvertent mistake and probably should not have been said but urged that it was not substantially prejudicial to defendant, arguing that 
* * * the jury has already heard testimony that that child, from the words of Dr. Pietrucha, was dehydrated and malnourished, and if that's not enough to let them know that the child was not properly cared for, then how can this [the challenged answer] possibly influence *135 them more. That's when I say that this has to be seen in the totality of the case.
Defense counsel declined the trial court's offer to give the jury a cautionary instruction regarding the matter on the ground that it would only lend emphasis to the damage which he opined had been "irretrievably committed". The motion for a mistrial was denied  the trial court observing in part 
* * * The question is not easy to resolve, but I lean towards continuation of the trial, and will make it declared [sic, clear?] to the jury that the only issues in this case are those which are raised by the Indictment, and nothing else * * *
(The trial judge again solicited a request from defense counsel limiting the impact of the testimony. Even assuming admissibility, of which more later, none was forthcoming from the defense and we perceive no meaningful instruction in the Court's final charge to the jury to that end. See Evid. R. 6.)
On cross-examination, Dr. Pietrucha testified that "child neglect" was a medical term. We observe here that Dr. Shuster, a State's witness did not feel that it was. (No authority is cited supporting Dr. Pietrucha's view on this point. We find none and are satisfied that the words constituted an ultimate fact in issue in the indictment. See Biro v. Prudential Ins. Co. of America, 110 N.J. Super. 391 (App. Div. 1970); rev'd 57 N.J. 204 (1970)).
The Chief Medical Examiner for Middlesex County, Dr. Marvin Shuster, performed an autopsy on Kimberly's body on October 27, 1971 and on the basis of having completed the gross portion of it listed second and third degree burns as the primary cause of death with dehydration and malnutrition as secondary causes. The burns, thermal in nature, covered 15% of Kimberly's body and were found on the right side of her face, neck, right arm, and the right side of her body and hips. He noted blisters and opined that blisters could occur post-mortem provided the body contained sufficient *136 fluids when burned. He concluded after examining sections of the tissues and skin microscopically that the burns here were in fact post-mortem. He amended the death certificate as we noted earlier. Dr. Shuster stated that there was a difference of opinion in the medical profession as to whether blisters might be formed on a body when burns occur post-mortem. During the autopsy be found a stool in the body which appeared to him to be a milk stool indicating that that she had ingested milk at some time. He concluded from his examination that Kimberly had not had food for at least four hours prior to death and stated that the malnutrition he observed in her was moderate to marked as opposed to severe. (The State contended that the child was dead before contact with the heater. Dr. Shuster testified that if Kimberly were dead it would obviously have been impossible for her to have rolled onto the radiator. It was during the examination of Dr. Shuster that the Prosecutor stated that he felt he could "* * * analogize this situation with the standard charge on escape * * *" It was implicit both here and during his summation that he was suggesting that defendant  or perhaps someone on her behalf  placed the child's body on the radiator so as to obscure the cause of death.)
Dr. Edwyn Albano, the Chief Medical Examiner of New Jersey, examined a small sample of skin removed from a burned area on Kimberly's body and concluded that the burns were post-mortem, and that it was possible for a blister to form after death. He added that it was possible for some burns on one part of a body to be post-mortem while on another part to be ante-mortem.
Dr. Lewis Krafchik, an admittedly well-qualified pediatrician, testified that an infant could survive on milk and indeed thrive on it up to about eight or nine months of age and that anyone could tell that a child who weighed in excess of eight pounds at two months of age and under eight pounds at seven months of age was malnourished. Dr. Krafchik opined that Karen also was suffering from malnutrition and deprivation. He stated that identical twins have virtually *137 identical body functions. He further testified that a child can die of dehydration without being malnourished and that extreme temperatures in a room can contribute to dehydration in an infant. Based upon reports he had read and viewing pictures of Kimberly's body Dr. Krafchik opined positively that the cause of death was malnutrition and he did not think that the burns on her body caused death.
The defense was articulated through several witnesses 
Barry Williams, who dated defendant's younger sister and who knew defendant for approximately seven years, testified that he came to defendant's apartment on the fateful day sometime before noon. He was joined there later in the afternoon by Mrs. Dorothy Lawrence. Defendant and Mrs. Lawrence were sponsoring a fashion show and they found it necessary to correct tickets for the affair since the printer had made a material omission on them. Williams joined defendant and Mrs. Lawrence in correcting the tickets. At the time Kimberly and Karen were in a bedroom in the apartment. While so engaged defendant was called from the apartment by a neighbor and during her absence Williams went into the twin's bedroom to look for a pen. He noticed that Kimberly was between the wall and the bed. He described her position as 
Well, she was on a slant, with one of her arms down towards the heater, in between the wall and the bed. She was down, like that, and her head was, like, going upward, and her back was, like, towards the down  between the wall and the bed.
He testified that most of Kimberly's body was on the bed.
When Williams went into the room and found Kimberly it was "pretty hot" with a temperature of "about 80, 85". He said that the heat was almost unbearable. He had on prior occasions experienced intense heat in the apartment. He picked Kimberly up from the bed and her body was stiff and hard, whereupon he called Dorothy Lawrence. Mrs. Lawrence came into the room, took Kimberly's body and began to run out of the bedroom when she bumped into defendant *138 who in turn took the body and began breathing into her mouth. Defendant, according to Williams,  "yelled for somebody to call the ambulance."
Williams had known the infants since they were about three or four months old and in his view they were "pretty healthy, pretty happy * * *." He testified that he personally fed both Kimberly and Karen milk out of a bottle sometime during the morning of October 26, 1971.
Dorothy Lawrence, a neighbor and friend of defendant's, recounted essentially the same facts regarding the fashion show and the correction of tickets. She heard Barry Williams yell to get defendant and she went into the bedroom to see what was happening. Defendant returned to the apartment hysterically, took Kimberly from her and began to breathe into her mouth. Mrs. Lawrence called the rescue squad which arrived almost immediately. She had been in defendant's apartment on numerous previous occasions and saw Kimberly and Karen being fed. She testified that defendant had the reputation of being a good mother. She never heard of nor personally observed any indifference to the twins by defendant or acts of not caring for them or defendant's three other children, aged four, three and two.
Three other neighbors of defendant  Carol Bryant, Hattie Bradley and Frances Jackson  who had observed the children up to about one month before Kimberly's death were in essential agreement that defendant had the reputation for being a good mother and that the children appeared normal and healthy. The State conceded on summation that these witnesses were  "telling the truth". Mrs. Jackson added that the heating conditions at the Tall Tree Apartments were unnatural and that as a result of that she and a group of tenants drafted a letter to Governor Cahill. Some action resulted therefrom although the record is not clear in that regard. She stated that when in defendant's apartment it seemed to be unusually warm and that on most of those occasions it was "very hot".
*139 Defendant's mother, Lavinia Walker, occasionally visited her and observed the twins being fed and that when she last saw them they appeared to be normal and happy.
Defendant testified in her own behalf and stated that on the morning of October 26, 1971 Barry Williams had taken care of her younger children, including the twins, while she walked her older son Gary to school. She stated that the children were fed that day both by herself and Williams. She recounted the activity with the fashion show tickets stating that while so engaged a neighbor called to her whereupon she left the apartment. She returned to the apartment having been advised that something was wrong with one of the babies. She went into the bedroom, picked up Kimberly and ran out of the apartment blowing into her mouth. She testified that nothing was wrong with the twins when she put them to bed. She always fed the children and never intended to withhold food from them. She conceded that the twins had lost weight but did not think this was abnormal. She did not feel that the twins were in need of medical attention during the month of October. She explained her lack of concern for the weight loss by stating  "And by them being twins, I thought this was normal, that when they got older they would pick up weight." She denied that Kimberly ever appeared to her as she was depicted in the pre-autopsy photographs.
In its instructions to the jury, the trial court specifically instructed them that it might not consider the burns as a cause of death or even a contributing cause thereof.
The trial court adopted the State's position that the neglect consisted in the failure to provide adequate food and medical attention  "and nothing else". A similar instruction was given in a supplemental charge addressed to a jury inquiry again specifically removing from their consideration the burns as a cause of or contributing factor of death. (Defendant never meaningfully advanced a defense of accidental burning and as already noted the State merely alluded to the suggestion of a cover up.)
*140 Following the jury finding of guilt on both counts of the indictment, defendant moved for a judgment of acquittal notwithstanding the verdict or in the alternative for a new trial. Defendant emphasized during argument on the motion 1) "the Pietrucha answer" i.e., placement of Karen in a foster home, and that her case was one of "child neglect"; 2) the "trial within a trial" as it related to Karen; and 3) the failure of the trial court to instruct the jury on her request on "proximate causation" between the alleged child neglect and Kimberly's death. The State argued that Karen's condition was admissible under Evid. R. 55 to show "lack of accident" in defendant's treatment of Kimberly. The trial court in response to the motion granted a new trial on the manslaughter count only stating 
* * * I am satisfied in my mind, having lived through the trial, that the remark at that time was so devastating in the light of the charge being made against the defendant, and in light of the inference to be drawn by the jury on the theory of the State's case, and that is that she would intentionally have caused those burns, or somebody placed the child on that radiator, whether that was of very great likelihood after the child had expired; and you take that entire picture, and we're concerned with a fair trial, justice, the woman has five children. She had five children. Granted she neglected the child, neglected the children. That, of course, is a far cry from manslaughter * * *
Using hindsight, I suppose I made a mistake in not granting a mistrial right then and there. However, that error cannot be corrected excepting in resolving the issue that's presented in favor of the defendant now * * *
He concluded with 
It is my considered judgment that the evidence established neglect of a child beyond doubt. However, as to the manslaughter count, I cannot say the same. There, there were so many questions involving credibility and changing of the death certificate, and burns contributing or causing the death, and the inference that the child being dead of malnutrition, must have been moved to the heater by some force, and the State urged the inference of the mother doing it to cover up. That in my judgment, highly prejudicial matter, such as Dr. Pietrucha's statement was enough to tip the scales in favor of the State as to the manslaughter count.
*141 On these cross-appeals the State argues for the reinstatement of the manslaughter conviction arguing basically that there was no showing by defendant of a manifest denial of justice and that the trial court abused its discretion in granting a new trial on the manslaughter count since it was in effect substituting its judgment for the jury verdict.
Defendant argues that the new trial was mandated since 1) there was a manifest denial of justice, 2) that the trial court erred in its failure to charge "proximate cause", 3) that the trial court should have entered a judgment of acquittal on the child neglect count since it merged with the conviction of manslaughter, 4) that the trial court erred in denying a new trial as to the child neglect count and 5) that the court erred in permitting the testimony regarding the condition of the surviving twin Karen.
We need not decide here whether the trial court's basic reason for granting the new trial, namely the "devastating" response by Dr. Pietrucha, was so prejudicial as to mandate it since our review of the record satisfies us, that in the context of this case, the court erred on the broader ground of permitting the State to introduce proof of Karen's condition as primary evidence of the really single fact in issue  neglect of Kimberly. The Pietrucha response was in our view but a part of that erroneous climate.
It will be remembered that from the very opening of the trial the State contended and in fact proved that the surviving twin Karen was suffering from malnutrition and argued throughout that such proof was admissible as an exception to Evid. R. 55 to demonstrate in defendant absence of mistake on her part in the purported maltreatment of Kimberly.
We say again that reduced to its basics the case proceeded on the grounds of "* * * willfully failing to provide proper and sufficient food [and] medical attendance" by defendant to Kimberly. N.J.S.A. 9:6-1.
Evid. R. 55 provides 
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition *142 to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
That "other crime evidence" may be relevant and significantly probative is not the test. We deal here with a rule of exclusion. It has been noted that where the other crime is similar to the offense at issue and of recent vintage the probative weight thereof might be high however the proof is excluded by the rule in the interest of fundamental fairness and avoidance of undue prejudice to a party's cause. When other crime evidence is admitted a jury might tend to think of defendant as a bad person in general and thereby convict him in a criminal case for that reason alone. The rationale of the rule is grounded in the policy of assuring a litigant's right to a fair trial where an impartial determination is made on the facts of the case at bar absent extraneous and prejudicial material. See Report of New Jersey Committee on Evidence (1963 ed.) (1963 Report), Comment on Rule, at 101-102; Compare State v. Harris, 105 N.J. Super. 319 (App. Div. 1969).
Evid. R. 55 by its terms of course does not proscribe the introduction of proofs of other crimes under all circumstances. The exceptions to the rule explicitly make other crime evidence admissible to prove some other fact in issue. Inadmissibility is grounded in the tendency of such evidence to be highly prejudicial and great care should be taken by a trial judge before admitting it. A court should be convinced that other crime evidence relates to a fact truly in issue and that it is not being introduced on some spurious ground. See State v. Professional Credit Corp., 112 N.J. Super. 286 (App. Div. 1970).
The State presses here its argument that the proof of Karen's treatment by defendant was admissible from the outset to show that there was no mistake by defendant in her alleged maltreatment of Kimberly.
It asserts 
*143 Certainly, the jury should learn that a twin sister of the deceased child, who was living in the same apartment with the deceased, and with the defendant, was also suffering from severe malnutrition and dehydration.
This testimony goes directly to the issue of intent on the part of the defendant to do the acts in question and to the state of mind of the defendant and especially, and more importantly, to counteract the contention of the defendant that the child's death was accidental. (emphasis added)
This does not persuade. At the moment the State addressed its opening remarks to the jury  and Karen was then introduced  there was no "contention" to "counteract". The defense ultimately and simply was no wilfull neglect.
The record before us does not reflect that the State's position has ever been that defendant intentionally harmed Kimberly or Karen but rather that she was guilty of wilfull and gross neglect of them. Whatever logic may reside in the State's theory that since Karen evinced signs of malnourishment, proof of that should have indicated to defendant that she was similarly mistreating Kimberly, that reasoning quickly is diluted by observing that defendant may not have been alerted to their deteriorating condition since in her mind their development was as it was because of the fact that they were twins. Additionally, we are satisfied that whatever relevance and probative force Karen's condition had, it was clearly outweighed by the inflammatory prejudice to defendant here. Evid. R. 4. Karen's condition was not a fact in issue. The "Pietrucha answer" only serves to highlight the evil in the receipt of the proof. See Comment on Rule 55, at p. 223 where we find 
No matter what the theory advanced for admission of other crime evidence, before other crime proof may be admitted, it should be shown that the evidence possesses independent relevance to the case, and that this relevance is not substantially outweighed by the risk that the evidence might produce prejudice or confusion. See 1963 Report, Comment on Rule 55, at 102-104; 1955 Report Committee Annotation, at 108. If the evidence is admitted, the jury must be instructed pursuant to Rule 6 of the limited weight which may be given to it. (emphasis added)
*144 We do not perceive in this record that the State demonstrated that the proof of Karen's condition possessed independent relevance to the case and that that relevance, if any, was not substantially outweighed by the risk that it might produce prejudice or confusion of issues.
In State v. Professional Credit Corp., supra, a corporate collection agency and its president were convicted of obtaining money under false pretenses. The conviction was reversed on the ground that the collection agency's claim of interest from a debtor, not authorized by the creditor client did not constitute deception or fraud. The Court noted that other complaints were then pending against the same defendants on which indictments had either been returned or upon which indictments had been sought. The Court observed at p. 290 regarding this other crime evidence that 
The trial court admitted testimony concerning other accounts collected by the corporate defendant. This testimony tended to show that although the corporation collected interest on such other accounts, it did not pay the interest over to its client. In our opinion, the testimony had no relevance to the charge of obtaining money from Mrs. Somers by false pretenses or to the conspiracy charge. The evidence was not admissible under Rule 55 of the Rules of Evidence.
An expression for the rationale of the Rule and its exceptions were recited by Justice Heher in State v. Kociolek, 23 N.J. 400, at 418 (1957) 
"There are exceptions to the general rule that upon the trial of a person for one crime `evidence that he has been guilty of other crimes is irrelevant," related to opportunity, motive, intent, a particular element of the crime charged, and the like, as (a) when the `circumstance of the crime charged and those of an extraneous crime indicate that they were both committed by the same person'; (b) when the accused's `perpetration of an extraneous crime shows that he had the opportunity of committing the crime in issue'; (c) when `the several crimes may have sprung from a single motive, aiming at the accomplishment of the same end'; (d) when the commission of a different offense `discloses a motive for the commission of the offense charged, e.g., the defendant's adultry [sic] with a wife may be relevant on his trial for the murder of her husband'; (e) when `one crime may have been perpetrated as a preparation for, or means *145 of committing, concealing or escaping from another'; (f) when the `acts charged to be criminal may reasonably be innocent, and are criminal only when performed with a certain intent or with knowledge of a certain fact,' in which case `other acts of the defendant, though criminal, may be adduced to prove that he had such specific intent or knowledge,' e.g., `utterance of counterfeits, the making of false pretenses, the reception of stolen goods, the publication of libels, and, probably, occurrences claimed by the defendant to be accidental'; and (g) `in general it may be said that whenever the defendant's guilt of an extraneous crime tends logically to prove against him some particular element of the crime for which he is being tried, such guilt may be shown.' Yet `it must not be supposed that the defendant's propensity to commit crime, or even to commit crimes of the same sort as that charged, can be put in evidence to prove his guilt of the particular offense, for however reasonable would be the deduction that, when a pocket is picked in a group of persons, of whom only one is addicted to picking pockets, he is the offender, his singularity in this respect could not, under our legal theory figure as proof of his guilt; there must appear, between the extraneous crime offered in evidence and the crime of which the defendant is accused, some other real connection, beyond the allegation that they have both sprung from the same vicious disposition.' State v. Raymond, 53 N.J.L. 260, 264 (Sup. Ct. 1891), Dixon J. See also State v. Lederman [112 N.J.L. 366], supra; State v. Noel [102 N.J.L. 659], supra.; State v. Lanto, 98 N.J.L. 401 (Sup. Ct. 1923), affirmed 99 N.J.L. 94 (E. & A. 1923); State v. DePaola, 5 N.J. 1 (1950). (emphasis added)
See also State v. Ascolese, 59 N.J. Super. 393 (App. Div. 1960); State v. Neff, 67 N.J. Super. 213 (App. Div. 1961).
Cases illustrative of admissible "other crime evidence" may be found in State v. Baldwin, 47 N.J. 379 (1966), cert. den. 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966) (proof of involvement in robbery, as motive for murder of prospective witness;) State v. Sinnott, 24 N.J. 408 (1957) (In sodomy prosecution proof of similar act on another at same time and place, admissible as part of res gestae and evincing common plan); State v. Mulero, 51 N.J. 224 (1968) (Proof of prior beatings of victim in murder prosecution to evidence intent or negative innocent intent. It was noted that relevancy there "may be debatable."); State v. Donohue, 2 N.J. 381 (1949) (Proof of prior beatings of victim in murder case as evidence of malice or ill will); State v. Jones, 94 N.J. Super. 137 (App. Div. 1967) (Proof *146 of escape from custody pending armed robbery prosecution admissible on issue of defendant's consciousness of guilt); State v. Smith, 84 N.J. Super. 452 (App. Div. 1964), certif. den. 43 N.J. 270 (1964) (Proof of solicitation of victim in rape prosecution to commit acts of perversion admissible as part of res gestae and evincing defendant's state of mind); State v. Mor, 85 N.J.L. 558 (Sup. Ct. 1914) (In prosecution for fraud for sale of short weighted goods, admissible to show similar sales to others at about same time  "for a single purpose only"  to negative that the involved sale was the result of mistake.)
We do not view the case before us as within the rationale of the authorities just mentioned. See also McCormick, Evidence, § 157, p. 329 (1954).
We do not deal here with a situation where a defendant may have been alerted to purported wrongdoing on the basis of some prior criminal activity but rather with an alleged contemporaneous willful neglect of identical infant twins who by the testimony of the State's medical witnesses would tend to either thrive or suffer in identical fashion if treated similarly. Thus, in our view the challenged proofs did not have sufficient probative force to prove, as an other fact in issue, defendant's absence of mistake or accident. Evid. R. 55.
We find the error to be of a quality warranting reversal since we cannot say that the demonstration of defendant's guilt was so clear that the challenged proofs did not affect the result. State v. LaPorte, 62 N.J. 312 (1973). The State concedes that if we agree with the trial court that Dr. Pietrucha's "devastating" statement affected the manslaughter count, it could not argue that it would not have the same effect on its consideration of the charge of child neglect. In this regard, since we find broader error, we hold that the testimony regarding Karen likewise tainted the conviction on the count of child neglect.
We perceive no merit to defendant's argument that the court erred in denying its request to charge the jury on *147 "proximate cause" on the manslaughter count. Our review of the entire charge satisfies us that the court made it eminently clear that it would have to be shown beyond a reasonable doubt that death resulted from the asserted acts of neglect. State v. Wilbely, 63 N.J. 420 (1973).
Accordingly, we affirm the trial court's order granting a new trial on the manslaughter charge and reverse its denial of a new trial on the charge of child neglect. In view of our disposition here, we need not respond to defendant's other points of appeal adding only that the State concedes that if on retrial defendant is convicted of manslaughter the child neglect count will merge with it as a lesser included offense.
The matter is remanded to the trial count for a trial on both counts of the indictment not inconsistent with this opinion.
ALLCORN, J.A.D. (dissenting).
The evidence is undisputed that the deceased child (Kimberly) and a twin sister (Karen) were born on March 16, 1971, in normal, healthy condition; that when examined on May 11, 1971, approximately two months after their births, the doctor found both to be in normal condition and in good health; that when next examined 4 1/2 months later (October 26, 1971), at the age of seven months, Kimberly was dead as a result of malnutrition and dehydration (postmortem photographs depicting the emaciated condition of the child's body providing unneeded corroboration), and her twin (Karen) was alive but suffering from malnutrition and dehydration; and that during the whole of the brief seven months of Kimberly's lifetime, she and her twin were in the sole care, custody and charge of their mother, the defendant. Despite the fact that she had three other children aged two, three and four years, and although she concedes to having been conscious of the loss of weight of both the twins, defendant claims to have been unaware that both children were literally starving.
*148 Thus, the critical issue in this case is whether the death of Kimberly was due to the knowing failure of defendant to provide the child with food adequate to sustain her life  or, as counsel for the defendant posed the question to the jury during summation, whether the death of the child was the result of "an honest mistake" by defendant or the product of a "willful mind." Except for the proofs regarding the condition of the deceased child, no evidence could be more relevant, cogent and material in the resolution of this issue than evidence that the twin of the deceased child, living in the same household during the same period of time, under the care, custody and charge of the same mother, was likewise suffering from malnutrition and dehydration, and manifested the same external symptoms of neglect and lack of nourishment as those exhibited by the deceased child, including weight loss and emaciation.
So viewed, the testimony as to the physical condition of the surviving twin was clearly admissible to demonstrate that the malnutrition and dehydration from which the one child died was the result of a "willful mind," rather than accident, inadvertence or an "honest mistake" on the part of defendant. However Evid. R. 55 may be regarded, whether as a rule of exclusion or otherwise, Stone, "The Rule of Exclusion of Similar Fact Evidence: America," 51 Harv. L. Rev. 988 (1938); Williams v. State, 110 So.2d 654 (Fla. Sup. Ct. 1959), cert. den. 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959), evidence of other criminal acts by a defendant is admissible thereunder so long as it is relevant to some matter in issue and is not received simply to show the general disposition of the defendant to commit crime. New Jersey Rules of Evidence (1972), Rule 55 and comment.
Where the proof of similar acts by defendant tends to establish that the offense for which defendant presently is on trial "was not inadvertent, accidental, unintentional, or without guilty knowledge," such evidence is admitted in almost all jurisdictions, including New Jersey. McCormick on Evidence (2 ed. 1972), § 190; State v. Fay, 127 N.J.L. 77 *149 (Sup. Ct. 1941); State v. Popick, 83 N.J.L. 318 (Sup. Ct. 1912). In recognition of this long established principle, Rule 55 itself expressly provides that such evidence "is admissible to prove * * * knowledge * * * or absence of mistake or accident."
Prosecutions for maltreatment and other offenses against children are no different in this respect than are prosecutions for any other type of criminal offenses. And, where other similar acts by defendant are relevant to establish some matter in issue (not including defendant's general disposition to commit crime), proof of such other acts is admissible  whether they involve the same or other children, and whether they occur prior to or contemporaneous with the offense for which defendant is standing trial.
Thus it is that where a defendant is charged with the commission of an offense against one child, evidence of the commission by defendant of the same or similar acts against other children, prior to or contemporaneous with (or, on occasion, subsequent to), the offense in question is held to be properly admissible. Illustrative are cases involving physical mistreatment. Williams v. People, 114 Colo. 207, 158 P.2d 447 (Sup. Ct. 1945); State v. Sanchez, 94 Idaho 125, 483 P. 2d 173 (Sup. Ct. 1971); State v. Bradford, 259 La. 381, 250 So.2d 375 (Sup. Ct. 1971); Commonwealth v. Boykin, 450 Pa. 25, 298 A.2d 258 (Sup. Ct. 1972); sexual offenses, State v. Wilson, 320 S.W.2d 525 (Mo. Sup. Ct. 1959); State v. Sinnott, 24 N.J. 408 (1957); State v. Sims, 4 Wash. App. 188, 480 P.2d 228 (Ct. App. 1971); Hendrickson v. State, 61 Wis.2d 275, 212 N.W.2d 481 (Sup. Ct. 1973).
Likewise, such evidence is admitted where it involves the same or similar acts committed upon or against the same child or children  physical mistreatment, People v. Brommel, 56 Cal. 2d 629, 15 Cal. Rptr. 909, 364 P.2d 845 (Sup. Ct. 1961); Fabian v. State, 235 Md. 306, 201 A.2d 511 (Ct. App. 1964), cert. den. 379 U.S. 869, 85 S.Ct. 135, 13 L.Ed.2d 72 (1964); Commonwealth v. Cutler, 356 Mass. 245, *150 249 N.E.2d 632 (Sup. Ct. 1969); sexual offenses, State v. Finley, 108 Ariz. 420, 501 P.2d 4 (Sup. Ct. 1972); contributing to delinquency, State v. Holleman, 225 Or. 7, 357 P.2d 264 (Sup. Ct. 1960); furnishing alcoholic beverages, Schnee v. State, 254 Ind. 661, 262 N.E.2d 186 (Sup. Ct. 1970).
In short, there is nothing whatever in the case presently before the court, factually or legally, that would justify the exclusion of the evidence regarding the physical condition of the twin of the deceased child. Compare State v. Mulero, 51 N.J. 224 (1968). And, no limiting instruction having been sought, none was required. See, e.g., People v. Kelly, 386 Mich. 330, 192 N.W.2d 494 (Sup. Ct. 1971); People v. Harper, 39 Mich. App. 134, 197 N.W.2d 338, 340-341 (App. Ct. 1972); 1 Wigmore on Evidence (3 ed. 1940), § 13 at 301; cf., Evid. R. 6.
So far as concerns the testimony of Dr. Pietrucha, the challenged portion hardly may be said to have been "clearly capable of producing an unjust result" when considered in the context of the offenses with which defendant was charged (child neglect and manslaughter) and in the light of the supporting evidence. R. 2:10-2. Moreover, even making the dubious assumption that the testimony was prejudicial, any prejudice could have been readily cured by appropriate instruction by the court at that point in the trial. Counsel for defendant, however, declined the offer of the trial judge to give such curative instruction.
For these reasons I would reverse the order granting a new trial, reinstate and affirm the judgment of conviction for manslaughter, and vacate the judgment of conviction for child neglect as a lesser included offense of manslaughter. State v. Sims, 65 N.J. 359 (1974).