STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
KENNETH JOHN LINDER, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 24, 1979—Decided October 11, 1979.

Before Judges ALLCORN, MORGAN and HORN.

*Mr. Stanley C. Van Ness*, Public Defender, attorney for appellant (*Mr. Barry D. Szaferman*, designated attorney, of counsel and on the brief).

*Mr. John J. Degnan*, Attorney General, attorney for respondent (*Ms. Ruth Schlesinger Sherman*, Deputy Attorney General, of counsel and on the brief).

PER CURIAM.

In this case defendant Kenneth John Linder appeals from a judgment of conviction of murder in the first degree (*N.J.S.A.* 2A:113–1 and 2) and of being armed during the murder (*N.J. S.A.* 2A:151–5), entered on the verdict of a jury.

Defendant and one Harry Stahl were jointly charged and tried for these offenses. The jury found Stahl guilty of murder in the second degree and of possessing and carrying a dangerous knife, but acquitted him of charges of being armed during the murder and of possessing the knife with intent to use it unlawfully against another.

The judge sentenced defendant to life imprisonment on the murder conviction and a 1–2-year concurrent term on the armed aspect of the crime.

The events leading to the convictions occurred on the evening of July 7 and early morning of July 8, 1976. The victim, 15-year-old Corrine Wekwert, was stabbed to death in North Hudson Park in North Bergen during the very early morning of July 8, 1976. Shortly before her death Corrine had sniffed paint at a place known as the "Ropes." With her were three teen-aged boys, defendant (age 17), Harry Stahl (also age 17) and Robert Emord (age 18). At the trial the three boys' versions of the events leading to Corrine's death varied significantly.

It is not disputed that the foursome arrived at the Ropes area and began sniffing paint around midnight. At about one o'clock Emord took a walk with Corrine, and shortly thereafter defendant and Stahl (who went to look for the couple) observed Emord and Corrine engaged in sexual intercourse. After a few minutes Emord and Corrine returned to the area where the foursome sniffed paint. At that point the testimony diverged.

According to defendant, Stahl took Corrine for a walk shortly after she returned. When Stahl returned he indicated to defendant by a hand and arm motion that he had had sexual intercourse with Corrine. Defendant then put his arm on Cor-

rine's chest and started kissing her. Corrine rejected his advances and he moved away. Emord then took Corrine's pants off and it "looked like" they again had sexual intercourse. Defendant was then going to attempt to have sex with Corrine, but decided not to because she had previously rejected him.

According to codefendant Stahl, he did not take Corrine for a walk after she returned with Emord. Stahl claimed that Emord and Corrine returned and defendant began to press himself upon Corrine. When Corrine resisted, Emord assisted defendant by holding Corrine down. According to Stahl, defendant unbuckled Corrine's pants and took her shoes and pants off. Emord then had sex with Corrine. Defendant tried to have intercourse with Corrine, but could not achieve an erection. Corrine began crying and the foursome left the Ropes area.

Emord agreed with defendant that Stahl and Corrine went for a walk and that upon his return Stahl gestured up and down with his fist and mumbled, "I got her," indicating he had sexual relations with Corrine. Emord also testified that defendant tried to have sexual relations with Corrine, but that she rejected him. According to Emord, he did not have sex again with Corrine.

The testimony of the witnesses also diverged substantially regarding the circumstances of Corrine's death. Defendant testified that as the foursome left the Ropes area and made their way through North Hudson Park, Stahl and Corrine talked to each other. As they approached Bergenline Avenue Emord stopped and Stahl approached him. Defendant said he could not hear any of the conversation between Emord and Stahl. Corrine was crying at that time and saying, "Why did youse do it to me?" Stahl told Emord to grab Corrine, and Emord knocked her down and grabbed her left arm and mouth. Stahl grabbed Corrine's right arm and put his knee on her stomach. Stahl then began chopping at Corrine's neck with a knife (a folding, double-bladed knife which Stahl kept in a brown leather holster

on his belt). Stahl then said "the guy" and all three ran off, with defendant trailing.

Stahl testified that Corrine was crying as the foursome left the Ropes area. Corrine was getting louder and demanded of the boys, "Why did youse do that?" According to Stahl, defendant turned to Corrine and said, "Shut up or I will kill you." Defendant also put a knife to Corrine's chin. Corrine kept walking and crying, and Emord turned around and knocked her down. Defendant then stabbed Corrine with Stahl's double-bladed knife. Stahl then said somebody is coming and they all ran away.

Emord testified that as the foursome left the Ropes area Stahl approached him and asked what they should do about Corrine's crying and yelling. Emord replied that if Corrine called the cops and said the boys raped her they could get people from the area to come to court and say that Corrine was easy, that she performed sex willingly. Stahl, after speaking to defendant, ran to Corrine, pushed her with his forearms and said, "Grab her." Emord grabbed one arm and defendant grabbed the other. Stahl sat on Corrine's stomach and began stabbing her with his double-bladed knife. After Stahl stabbed Corrine two or three times in the neck, Emord walked away. According to Emord, defendant said, "If you can kill her I can kill her." Emord did not see defendant stab Corrine, however, Stahl then said, "Run, the guy," and the three boys fled.

The foregoing recital demonstrates, as stated by the prosecuting attorney in his summation, that each defendant was trying to place the blame on the other one. The jury was required to make its judgment probably more on the basis of credibility of the three boys than anything else.

At the time of the homicide Stahl was a sailor in the United States Navy. He had been home on leave, but had overstayed his allotted leave time. On July 2, 1976, on obtaining leave, he had purchased a knife and case, which he carried on his person. The knife used in killing Corrine was the one purchased and

carried by Stahl. After the stabbing Stahl conceded that he washed off the knife.

At the outset of the trial, before the jury was selected defendant's lawyer requested that the trial judge require Stahl to change from his navy uniform, in which he appeared in court, into civilian clothes. He further stated:

> . . . He wasn't wearing this uniform on the night that this alleged happening occurred and I believe it will be highly prejudicial since there is a co-defendant in this case . . . .

The judge denied the request in the following words:

> I have listened to what [Stahl's] counsel had to say with respect to his inability to have clothes other than those in the service. We are proud of those who are in the service and I believe they have the right to wear what they want, whether it be in a court of law, in the capitals of our states or in the capital of our nation . . . . .

Although the fact is that Stahl was permitted to wear his navy uniform during the entire trial, which commenced May 31, 1977 and concluded June 24, 1977, defendant has failed to provide this court with any authority or to argue the point except as an adjunct to the sole ground of appeal which is stated hereinafter.

We need not determine in this case whether Stahl had a constitutional or other right to wear the uniform during the trial. This question can best await a case where the matter is presented squarely. However, we must note our disagreement with the trial judge, who should have been more solicitous in providing a fair trial for both defendants than with respect to the right of a member of the armed forces to wear the uniform. Even if he could not compel Stahl to wear civilian clothing, he could have taken other measures to protect defendant against unfair comparison by reason of Stahl's garb.[1] He could have ordered separate trials if it would mean that prejudice to defendant could have been eliminated and if he believed that he

---

[1] It is interesting to note the probable impression on the jury. The prosecuting attorney in his summation said that Stahl looks like an "all-American boy" and testified in "a Naval uniform."

did not have the right under the circumstances to compel Stahl to wear civilian clothing.

Defendant contends in this appeal that the trial judge grievously erred to defendant's prejudice in permitting continued cross-examination of defendant concerning his prior LSD use. We agree and accordingly reverse the conviction.

On cross-examination defendant admitted he was "high" on the day Corrine was stabbed to death. Stahl's counsel then asked if defendant had taken LSD that day, and a *voir dire* ensued to determine whether such evidence was admissible.

Out of the presence of the jury, counsel for Stahl questioned defendant concerning two letters he wrote from prison, allegedly concerning his use of LSD at different times than the day in question.

When defendant was asked during the *voir dire* hearing when he last had ingested LSD prior to the stabbing death of Corrine, he replied that it was "[a]bout a month or so" before Corrine's death. He also said he had not had any LSD since then.

Following that hearing the trial judge ruled as follows concerning the questioning of defendant about his LSD use:

Well, I am going to adopt a middle ground. I will permit you, Mr. McAlevy [Stahl's counsel], to ask this witness whether, in fact, he ever used LSD.

If his answer is, "Yes," you may then ask him whether or not he used it on the day in question and leave it at that.

The following occurred after the trial judge's ruling:

CROSS EXAMINATION BY MR. MC ALVEY (CONTINUED):

Q Mr. Linder, do you know what LSD is?

A Yes, I do.

Q Is that the same as acid?

A Yes.

Q And is it not true, sir, that in the year of 1976, and prior to your arrest, that you, sir, did, in fact, use LSD?

A Yes.

Q And, sir, on the night—how often did you use LSD?

MR. SCHEURER [counsel for defendant]: Objection.

THE COURT: No, I will permit it.

A  When I came around.

Q  Whenever you had it, you used it, isn't that right?

A  Yes.

Q  So, whenever you either had money to buy LSD, or somebody gave LSD to you, you used it?

A  Yes.

Q  And would it be fair to say that you consider yourself—or at least, back in 1976 you considered yourself, by your own interpretation, an acid freak?

A  Yes.

.    .    .    .    .    .    .    .

Q  Did you get high each and every day, and each and every night when you had the money to buy LSD, and LSD was available?

MR. SCHEURER: I object to the form of that question. It has a contradiction within itself.

THE COURT: Yes, please reframe it.

Q  Whenever LSD was available, you turned on, did you not?

A  Yes, I did.

Q  That was in the daytime, right?

A  Sometimes.

Q  Nighttime?

A  Yes, sometimes.

Q  Middle of the afternoon?

A  Sometimes.

Q  Early evening?

A  Sometimes.

Q  Late evening?

A  Sometimes.

Q  Early morning hours?

A  No.

Q  I see. No, you used acid in the morning, noontime, after dusk, and at night, but for some reason you don't do acid in the early morning hours?

A  No.

Q  That wouldn't be because that is the time young Corrine was killed, was it?

A  No.

Q  And, of course, you certainly on the day in question—the day that you tell us Harry Stahl stabbed this girl to death right in front of you, you absolutely were not doing acid, were you, Kenneth?

A  No, I wasn't.

Q  Were you high that day?

A  From drinking and sniffing.

Q  No, were you high that day?

A   Yes.

Q   And what were you high from?

A   Drinking and sniffing.

Q   No LSD, right?

A   No.

Q   How come?  None around?

A   None around.

Q   When is the last time that you can remember that you had LSD and acid before you tell us Harry Stahl plunged the knife into that girl's neck?

A   About a month or so.

Q   What happened?  The acid dried up around North Bergen?

A   Yes.

During his summation counsel for codefendant Stahl referred to defendant several times as an "acid head."  For example, he said that his client:

> .  .  .  is not on trial for knowing an acid head and a kid that gets stoned on LSD and paint, and whatever else he can get his hands on.  He is on trial for murder.

Talking about the night of the murder, counsel for Stahl referred to defendant as:

> .  .  .  The acid head—self-admitted acid head.  I don't mean to call him names, but that is what he admits to, being an acid head and using drugs night and day when he can.

Again talking about his client, Stahl's counsel said:

> Is this the kid that was ever in the Ropes area before?  Is the guy who sniffs paint along with an acid head and friends—the LSD guy?  Is he?  No, he is not.

At another point in his summation, counsel for Stahl said:

> Acid and paint.  Acid and paint.  Nice kids.  Nice kids.

Referring to defendant, counsel for Stahl said:

> What does Linder say?  Okay, he slaps the kid sister.  Acid head.  LSD.  You name it.

The State claims that the evidence introduced about defendant's LSD use assisted the jury in reaching a just conclusion. The State argues that it was important for the jury to know precisely what narcotics defendant had inhaled, ingested or

injected, because of the differing levels and lengths of intoxication produced, as well as the possible cumulative effect of utilizing several in conjunction. Once Stahl's counsel was permitted to ask defendant about his LSD use, the State claims that comment during summation about such evidence was proper. Also, the State says it is notable that defendant did not object at trial to the remarks at trial.

The State also makes the point that defendant's use of LSD should not have shocked the jury, given the testimony about the use of drugs involving all parties at the trial. The State argues that the references to defendant's LSD use involved a mere few minutes of testimony in a trial which lasted a complete month.

■ Defendant claims that the introduction of LSD into defendant's murder trial was an attempt to make defendant's character a matter for jury consideration.[2] We agree.

*Evid. R.* 47 specifically prohibits the prosecution from offering evidence of a trait of character of the defendant unless the judge has admitted evidence of good character offered by the defendant. *Evid. R.* 55 states that evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion. *State v. Wilson,* 158 *N.J.Super.* 1 (App.Div.1978), certif. den. 79 *N.J.* 473 (1978); *State v. Wright,* 132 *N.J.Super.* 130 (App.Div.1974), rev'd on Judge Allcorn's dissenting opinion, 66 *N.J.* 466 (1974). However, such evidence can be used to prove motive, intent, plan, knowledge, identity or absence of mistake or accident.

■ Where, as here, a defendant testifies on his own behalf, he does not thereby put into issue his general character or

[2]During summation the prosecuting attorney observed that "Mr. McAlevy sort of degraded Kenneth Linder."

propensities. When he takes the stand he continues to enjoy the same protections that he would otherwise have, except that his credibility as a witness is then projected for the fact finder's consideration. *State v. D'Ippolito,* 19 *N.J.* 540, 546–548 (1955); 29 *Am.Jur.2d, Evidence,* § 341 at 391.

█ The State also asserts that defendant's prior use of LSD is relevant to the question of his guilt in the stabbing death of Corrine. We do not concur. Defendant admitted that he was "high" the day of the incident from drinking and sniffing. But his guilt was not to be determined under the evidence from that fact. The issue as it developed was who (defendant or Stahl) had actually stabbed Corrine. In any event, the judge permitted Stahl's attorney to go much too far in his cross-examination and name-calling. There was no attempt by Stahl's attorney to show the cumulative effect of previous LSD use. No scientific evidence was produced at the trial to show that the ingestion of LSD one month prior to Corrine's murder could have induced defendant, after taking other drugs, to act in an especially abnormal way. Rather, Stahl's attorney used the fact of defendant's prior LSD use to try to create a gulf between the actions of his client, testifying in his navy blues, and an "acid head," namely, defendant. To the credit of the prosecuting attorney, he did not attempt to capitalize on the improper references.

The serious consequences to defendant and the utter lack of any foundation for the stated cross-examination and subsequent opprobrious remarks by Stahl's attorney are highlighted if not aggravated by the fact that the judge charged the jury as follows:

> Now, counsel for the State, Ladies and Gentlemen, in his summation made a statement relative to participants at the Ropes being intoxicated. The Court met with counsel prior to trial and it was stipulated that intoxication at the time of the killing is not an issue in this case; that is, intoxication by the ingestion of alcohol or sniffing paint is not an issue since all of the testimony indicated that the effects of paint sniffing last only between five and ten minutes, and the

participants walked some distance from the area of the Ropes to the site in the park where the girl met her death. You will recall probably, but use your own recollection, the last ingestion of any alcohol by any of the participants took place several hours before the killing.

Thus it appears clearly that the injection into the trial of the use of LSD by defendant was solely for the purpose of character assassination and to enhance Stahl's character by the contrast between his character and defendant's.

■ As in *State v. Thomas,* 76 *N.J.* 344, 363–364 (1978), we think that the extensive questioning and stamping of defendant as an "acid head," a most degrading reference, in the circumstances of this case, exacerbated by the presence of Stahl garbed in a navy uniform, "so prejudiced [defendant] that there is considerable doubt that he received a fair trial." See also *State v. D'Ippolito, supra* at 548, and Falknor, "Extrinsic Policies Affecting Admissibility," 10 *Rutgers L.Rev.* 574, 584 (1955–56).

For the foregoing reasons the judgment is reversed and the cause is remanded for a new trial.

